# In the United States Court of Federal Claims

BID PROTEST

No. 16-1684C

(Filed Under Seal: January 31, 2017 | Reissued: February 15, 2017)[*]

|  |  |  |
|---|---|---|
| MUNILLA CONSTRUCTION MANAGEMENT, LLC, | ) ) ) | |
| Plaintiff, | ) ) ) ) | Keywords: Bid Protest; 28 U.S.C. § 1491(b); Standing; Interested Party; Price Analysis; Price Reasonableness; Contract Line Items; Unbalanced Pricing. |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| SEAWARD SERVICES, INC., | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

*Stephen Gregory Joy*, Smith, Currie & Hancock LLP, Atlanta, GA, for Plaintiff. *Karl Frederick Dix*, Smith, Currie & Hancock LLP, Atlanta, GA, and *Alan I. Saltman*, Smith, Currie & Hancock LLP, Washington, DC, Of Counsel.

*Amanda L. Tantum*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General. *Joe D. Baker*, Navy Supply Systems Command, Fleet Logistics Center Jacksonville, Department of the Navy, Of Counsel.

*Shlomo D. Katz*, Brown Rudnick LLP, Washington, DC, for Defendant-Intervenor. *Daniel B. Abrahams*, Brown Rudnick LLP, Washington, DC, and *Tammy Hopkins*, Brown Rudnick LLP, Washington, DC, Of Counsel.

---

[*] This Opinion was originally issued under seal on January 31, 2017, and the parties were given the opportunity to request redactions. The parties disagree about the extent of redactions appropriate for this public decision, but the Court agrees with Plaintiff that its prices are proprietary, competition-sensitive information and should not be disclosed. This Opinion is now reissued with redactions.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiff Munilla Construction Management, LLC (Munilla) is currently performing port operations services at the United States Naval Base at Guantanamo Bay, Cuba, under a bridge contract with the United States Navy. Munilla filed this post-award bid protest on December 22, 2016, to challenge the Navy's award of a new contract to provide such services to Intervenor Seaward Services, Inc. (Seaward). ECF No. 1. The Navy awarded the contract to Seaward after finding that it had submitted the lowest-priced technically acceptable offer in response to the Navy's solicitation.

Munilla's protest centers around the validity of the Navy's price evaluation, which it claims did not comport with the requirements set forth in the solicitation. The government and Seaward contend that Munilla lacks standing to press its claims because another offeror, Crowley Government Services, Inc. (Crowley), was second in line to receive the award after Seaward. They also contend, in the alternative, that Munilla's claims lack merit and that, in any event, Munilla was not substantially prejudiced by any of the errors it has identified.

Currently before the Court are the parties' cross-motions for judgment on the administrative record. For the reasons discussed below, Munilla's motion for judgment on the administrative record is **DENIED** and the cross-motions for judgment on the administrative record filed by the government and Seaward are **GRANTED**.

## BACKGROUND

### I.    The Solicitation

On June 8, 2016, the United States Navy issued RFP N68836-15-R-0003 (the "RFP" or the "Solicitation"). Admin. R. (AR) Tab 25 at 320. The RFP sought offers to perform services involving the "operation of multiple watercraft and boats, related maintenance services, port operations, and waterfront administration" at the United States Naval Base, Guantanamo Bay, Cuba. Id. at 367. Pursuant to the RFP, the contractor would be responsible for "the operation, preventive, predictive, [and] corrective maintenance of various watercrafts, boats and equipment[;] industrial marine repair services[;] and . . . port operations services." Id. The Solicitation provided that services would be supplied "on a 'turn-key' basis with the Contractor providing all necessary management expertise, personnel, supplies, tools, equipment and vehicles" except as otherwise specified in the contract. Id. It set forth fifteen "primary tasks" illustrating the services the contractor would be required to perform, and specified that the contractor would be required to "plan, schedule, coordinate and ensure effective completion of all services described." Id.

The contract was to be a firm fixed-price contract. Id. at 477. Offerors were required to submit prices for forty-five contract line items (CLINs) on a price schedule included with the Solicitation. Id. at 478, 491; see also id. at 321–66 (listing CLINs). The CLINs represented the required tasks for each year of the contract. See id. at 321–66. The Navy initially sought proposals for a twelve-month base year and four option years, the first three of which were for twelve months and the fourth for eleven. See id. at 491. It subsequently amended the Solicitation

to alter the periods of performance to a "one month transition period, a 10 month base period[,] and four (4) one-year option periods." See id. Tab 123 at 3661–62.

Pursuant to the Solicitation, offerors were to submit their proposals in two volumes: 1) "Non-Price Evaluation Factor – Technical Capability"; and 2) "Standard Form 33 & Price Proposal." Id. Tab 25 at 477–78. Section M of the Solicitation, entitled "Evaluation Factors for Award," provided that the contract would be awarded "to the responsible Offeror whose proposal conforming to the solicitation [was] most advantageous to the Government, price and other factors considered[,] and [was] the Lowest Price Technically Acceptable (LPTA) Offer." Id. at 488. To make this determination, the Navy would evaluate proposals based on three factors: technical capability, past performance, and price. Id. With respect to price, "[a]n Offeror's proposed prices [would] be determined by multiplying the quantities identified in the Schedule by the proposed unit price for each [CLIN] to confirm the extended amount for each." Id. at 490. The government would then evaluate the prices submitted to determine completeness and reasonableness. Id. at 490–91.

Concerning completeness, the Solicitation stated, inter alia, that "[a]ll CLINs as stated in the solicitation shall be priced except for Reimbursable CLINs 0015, 1015, 2015, 3015 and 4015." Id. at 490. Offerors were required to structure their pricing "in accordance with the bid schedule of the SF 33" and to "return fully executed CLINs to include a unit price and total extended prices in accordance with the bid schedule provided in the solicitation and a total amount showing the sum of all line items." Id. at 491. In that regard, the Solicitation provided that "[f]ailure to submit a price for any CLIN could result in the proposal being considered unacceptable." Id. The Navy further advised offerors with respect to the reimbursable CLINs that "[e]valuation of the price proposal will include [the amount of $1,000,000] for all Reimbursable CLINs," and that "[n]o other price shall be submitted in the Offeror's Price Proposal for the [Reimbursable] CLIN[s]." Id. (emphasis omitted). It also stated that "[f]ailure to furnish the price proposal in accordance with the instructions above shall render the proposal unacceptable." Id.

As for the evaluation of price reasonableness, the Solicitation read as follows:

> 2. Reasonableness: [p]rice is fully justified and supported and is considered fair under current market conditions as well as reasonable to both the Offeror and the Government. Reasonableness may also be determined by comparing the proposed pricing with Government estimates and/or other offers received. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques. An offer may be rejected if the Contracting Officer determines that the lack of balance proposes an unacceptable risk to the Government. In accordance with FAR 15.404-1(g)(2) a price

analysis will be conducted on the individual CLINs to determine
whether unbalanced pricing occurred.

Id. at 490–91.[1]

To determine the lowest-priced offeror, the Navy would "add[] the total price for all
options to the total price for the basic requirement," along with the price for the "potential six
month[] option period available under FAR 52.217-8." See id. at 491. If the option prices were
"significantly unbalanced," the Navy warned offerors, it could "determine that [the] offer is
unacceptable." Id.

After the Navy issued the RFP, potential offerors were permitted to submit questions. See
id. Tab 43. SoBran, Inc. (SoBran) submitted an inquiry concerning whether the Navy might
consider performing a price realism analysis as part of its evaluation. Id. at 741. In that inquiry it
noted that, in its experience, "Lowest Price Technically Acceptable [contracts] may be awarded
to 'technically acceptable' bidders" even where "the winning price demonstrates that the bidder
does not have a clear understanding of the contract requirements." Id. It observed that
"[p]roposed prices significantly lower than all competitive bids received may demonstrate a low
bidder's inability to compr[e]hend the magnitude of the contract." Id. Therefore, SoBran asked,
"[w]ill the Government consider performing [a] Price Realism Analysis in addition to the Price
Reasonableness evaluation?" Id. The Navy responded to SoBran's question with a statement that
"[t]he Government shall conduct a Price Reasonableness evaluation in accordance with Section
M." See id. Tab 45 at 760.

## II.    The Offers

Five offerors submitted proposals in response to the Solicitation: 1) Crowley; 2) Metson
Marine Services, Inc. (Metson); 3) Munilla; 4) Seaward; and 5) SoBran. See id. Tabs 104–13.
Each offeror's total price, including all option years and reimbursable CLINs as required by the
Solicitation, was as follows:

---

[1] FAR 15.404-1(g)(2) provides, in pertinent part, that "[a]ll offers with separately priced line
items or subline items shall be analyzed to determine if the prices are unbalanced." Id. It further
states that "[i]f cost or price analysis techniques indicate that an offer is unbalanced, the
contracting officer shall— (i) [c]onsider the risks to the Government associated with the
unbalanced pricing in determining the competitive range and in making the source selection
decision; and (ii) [c]onsider whether award of the contract will result in paying unreasonably
high prices for contract performance." Id. "An offer may be rejected if the contracting officer
determines that the lack of balance poses an unacceptable risk to the Government." Id. § 15.404-
1(g)(3).

| Offeror | Total Price |
|---------|-------------|
| Seaward | $20,475,969[2] |
| Crowley | [***] |
| Munilla | [***] |
| SoBran | [***] |
| Metson | [***] |

See id. Tab 104 at 2655 (Crowley); id. Tab 106 at 2852 (Metson); id. Tab 108 at 2998 (Munilla); id. Tab 110 at 3207 (Seaward); id. Tab 112 at 3387 (SoBran); see also id. Tab 123 at 3683.

### III.    The Navy's Evaluation and Award Decision

The Navy convened a technical evaluation board to conduct a review of each offeror's technical capability. See id. Tab 116. The board evaluated each proposal using an adjectival rating system of "acceptable" or "unacceptable." See id. at 3508–19. It rated the proposals submitted by Crowley, Seaward, Munilla, and Metson as acceptable. Id.; see also id. Tab 123 at 3670–81. It rated SoBran's proposal unacceptable. Id. Tab 116 at 3516–19; see also id. Tab 123 at 3679–81, 3684.

To assist it in conducting and explaining its price evaluation, the Navy prepared a six-page abstract of the proposals. See id. Tab 122. The first page of the abstract contains a table that lists each offeror's base price, option year prices, and total price, from lowest total price to highest (including SoBran's prices). Id. at 3603. The remaining five pages consist of a more detailed table that sets forth the quantity, unit price, and line item total price for each CLIN for each offeror for the base period and each option year. Id. at 3604–08.

On September 28, 2016, Contract Specialist Elaine Florence[3] prepared an "Approved Business Clearance" memorandum to request approval to award a firm fixed-price contract to Seaward as the lowest-priced technically acceptable offeror. See id. Tab 123 at 3657.[4]

Section VI of the memorandum, entitled "Proposal Analysis," see id. at 3669, included in subsections A and B a summary chart of the technical evaluation board's ratings, with which the

---

[2] Seaward initially submitted its offer with a total price of $20,475,921, but after being informed of "minor mathematical errors" relating to rounding (see below), it provided a correction resulting in the price listed above. AR Tab 110 at 3207; id. Tab 121 at 3551–55.

[3] Although Ms. Florence was not the contracting officer responsible for evaluating the proposals, her memorandum sets forth the contracting officer's reasoning. The contracting officer was Darryl Nelson. See AR Tab 123 at 3609.

[4] Ms. Florence noted in the memorandum that Munilla was currently performing the port services under a bridge contract originally awarded June 1, 2015, and which at that time had extension options through November 30, 2016. AR Tab 123 at 3660.

contracting officer concurred, as well as a supporting narrative describing the technical panel's conclusions regarding each offeror's technical capability and past performance. Id. at 3670–79. As noted above, all but one of the offerors, SoBran, was rated technically acceptable. Id. at 3670.

Subsections C and D of Section VI of the memorandum (captioned "Price Proposal" and "Price Analysis," respectively) included a detailed discussion of the offerors' price proposals and the contracting officer's evaluation of them. Id. at 3681–86. Because the adequacy of these price evaluations is at the heart of Munilla's bid protest, the Court now sets forth in some detail the contents of that discussion.

Subsection C contains a restatement of the price evaluation criteria set forth in the Solicitation and two summary abstracts of all of the price proposals received, from lowest to highest. Id. at 3681–83 (Tables 2 and 3). Table 2 is an abstract of the actual figures contained in the price proposals of each of the offerors. Id. at 3683. As the memorandum explains, however, there were certain discrepancies and minor errors in the pricing proposals from Crowley and Seaward, which required adjustment of the pricing for evaluation purposes, reflected in Table 3. Id.

Thus, as noted above, the Solicitation had instructed offerors that the "Government ha[d] provided the . . . amount of $1 Million for each reimbursable CLIN." Id. Tab 25 at 478. Crowley's total proposed price, however, "did not include pricing for the [reimbursable] CLINs." Id. Tab 123 at 3683. According to the memorandum, the Contracting Officer found it unnecessary to seek clarifications from Crowley in light of the fact that it had stated in its price proposal that it understood the reimbursable CLINs would be added back in for evaluation purposes. Id. The contracting officer therefore "added $5 Million ($1 Million for each [reimbursable] CLIN)" to Crowley's price "for abstract . . . [and] evaluation purposes only." Id. This resulted in an increase in Crowley's overall price from [***] (as set forth in Table 2) to [***] (as set forth in Table 3).

In addition, Seaward's pricing proposal required an adjustment because it "contained multiple rounding calculation inconsistencies." Id. The contracting officer sought clarifications from Seaward, and Seaward submitted a corrected proposal with adjusted calculations. Id. As a result of those corrections, Seaward's price proposal increased by $48 from $20,475,921 (as set forth in Table 2) to $20,475,969 (set forth in Table 3). Id. Thus, as adjusted, the offerors' proposals reflected in Table 3 were as follows:

**Table 3**

| Contractor | Base Period | Option I | Option II | Option III | Option IV | Total Base Plus Options |
|---|---|---|---|---|---|---|
| (1) Seaward | $3,539,748.00 | $4,737,983.00 | $4,726,982.00 | $3,721,268.00 | $3,749,988.00 | $20,475,969.00 |
| (2) Crowley | | | | | | |
| (3) MCM | | | | | | |
| (4) SoBran | | | | | | |
| (5) Metson | | | | | | |

Id.

In addition to Table 3, which was actually reproduced in the body of the memorandum, the memorandum referenced and included as an attachment the six-page "detailed abstract" described above, which had been prepared by the contract specialist. See id. at 3659, 3683; see also id. Tab 122. That detailed abstract, as discussed, set forth the comparative CLIN unit and CLIN total prices contained in each offerors' proposal for the ten-month base period and for each of the four option periods. See id. Tab 122.

Subsection D set forth the Navy's price analysis. Id. Tab 123 at 3684–86. There, the Navy noted that the contracting officer had conducted a price analysis "utilizing FAR 15.404-1(b)(2)(i), comparison of proposed prices received in response to the solicitation." Id. at 3684. That provision states that the government "may use various price analysis techniques and procedures to ensure a fair and reasonable price." FAR 15.404-1(b)(2). It further states that "[e]xamples of such techniques include, but are not limited to . . . [c]omparison of proposed prices received in response to the solicitation," noting that "[n]ormally, adequate price competition establishes a fair and reasonable price." Id. § 15.404-1(b)(2)(i). The Navy further explained that "[c]ertified cost and pricing data [was] prohibited from this analysis in accordance with FAR 15.403-1(b)(1)(3)" because "adequate competition [was] present" and because "these [we]re commercial services." AR Tab 123 at 3684.

The Navy's price analysis identified Seaward as the lowest-priced technically acceptable offeror. Id. Its status as such was reflected in Table 4 of the memorandum, which listed the base year, option year, and total contract prices for each technically acceptable offeror, as well as in Table 5, which included the six-month extension option. Id. (Tables 4 and 5).

The Navy also stated in the memorandum that "the Contracting Officer evaluated the Contractors' proposed prices for Base Year and Option[] I through Option IV to determine whether unbalanced pricing occurred in accordance with FAR 15.404-1(g)(2)." Id. Table 6 then compared each offeror's price in the base period with their price for the first option year and reflected overall price increases between the periods as follows:

**Table 6**

| Contractor | Base Period | Option I | Price/Percentage Increase |
|---|---|---|---|
| (1) Seaward | $3,539,748.00 | $4,737,983.00 | Option I increased by $1,198,235.00 which represents *34% |
| (2) Crowley | | | |
| (3) MCM | | | |
| (4) Metson | | | |

Id. at 3685.

The Navy's analysis then identified the reasons for these increases, noting that the period of performance for the base year was ten months, while the period of performance for the first option year was twelve months. Id. Additionally, the Navy observed that the base period did not require any "docking regular overhauls (DROHs)," but that the option year required two, "one off-island and one on-island." Id. In light of these facts, the contracting officer concluded that "the price increases from the Base Period to Option I for all Offerors are acceptable." Id. He also found that "no unbalanced pricing exists between the Base Period and Option I." Id.

A comparison chart for Options I and II was contained at Table 7:

**Table 7**

| Contractor | Option I | Option II | Price/Percentage Decrease |
|---|---|---|---|
| (1) Seaward | $4,737,983.00 | $4,726,982.00 | Option II decreased by $11,001 which represents *0.2% |
| (2) Crowley | | | |
| (3) MCM | | | |
| (4) Metson | | | |

Id. In the memorandum, the Navy also set forth its conclusions regarding the reasons for these minor decreases in price as to each offeror: it noted that during Option II, the contract only required one docking overhaul which would be off-island (as compared to Option I, when there were two overhauls, one off-island and one on-island). Id. The Navy further noted that "[a] review of each Offeror's Price Proposal indicates that their proposed price for the DROH off-island for Option II is in line with their proposed price for the DROH off-island for Option I." Id. It observed that each contractor's price decreased by [***]% or less, and that "therefore there is no evidence of significantly understated pricing." Id. "Based on the nominal price decreases," the contracting officer concluded, as he had with respect to the increases between the base period and the first option year, that "all Offerors' proposed prices for Option II are acceptable and no unbalanced pricing exists between Option I and Option II." Id.

For Options II and III, a comparison chart was set forth at Table 8:

**Table 8**

| Contractor | Option II | Option III | Price/Percentage Decrease |
|---|---|---|---|
| (1) Seaward | $4,726,982.00 | $3,721,268.00 | Option III decreased by $1,005,714.00 which represents *21% |
| (2) Crowley | | | |
| (3)MCM | | | |
| (4)Metson | | | |

Id. In evaluating the price decreases for Option III, the Navy noted that "[t]he Contractor is only required to perform one (1) DROH on-island during the third Option Year, which explains the significant price decrease for all offerors except Metson." Id. It further explained that "[a]s illustrated in the detailed abstract of proposals, Metson's proposed price for the DROH on-island is significantly higher than the other three Offeror[]s['] proposed prices." Id. at 3685–86. For these reasons, the contracting officer concluded that "all Offerors' proposed prices for Option III are acceptable and no unbalanced pricing exi[s]ts between Option II and Option III." Id. at 3686.

Finally, the Navy included a comparison of the third and fourth option years at Table 9:

**Table 9**

| Contractor | Option III | Option IV | Price/Percentage Increase or Decrease |
|---|---|---|---|
| (1) Seaward | $3,721,268.00 | $3,749,988.00 | Option IV increased by $28,720.00 which represents *1% |
| (2) Crowley | | | |
| (3)MCM | | | |
| (4)Metson | | | |

Id. It noted that for the fourth option year, the contractor would be required to perform only one docking regular overhaul, on-island, and that "[a] review of each Offeror's Price Proposal indicates that their proposed price for the DROH on-island for Option IV is in line with their

proposed price for the DROH on-island for Option III." Id. The Navy further observed in the memorandum that "[a]ll Offerors' prices increased by [***]% or less with the exception of Crowley," whose price had decreased by [***]%. Id. Observing that "[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract items is significantly over or understated," the Navy noted that the contracting officer found "no evidence of significantly understated or overstated pricing." Id. "[T]herefore," the contracting officer concluded that "all Offerors' proposed prices for Option IV are acceptable and no unbalanced pricing exists." Id.

Section VIII of the memorandum, entitled "Decision to Proceed," then reflected the contracting officer's conclusion that "[t]his solicitation has provided adequate competition with four (4) technically acceptable proposals received[,] and Seaward Services, Inc. is the lowest priced technically acceptable Offeror." Id. at 3687. In particular, the Navy stated that "[p]rice analysis has been performed and the awardee's price has been determined fair and reasonable by the Contracting Officer based on adequate price competition in accordance with FAR 15.404-1(b)(2)(i)." Id. at 3688–89. Accordingly, the contracting officer recommended the award of "Firm-Fixed Price Contract N68836-17-C0001 to Seaward Services, Inc." Id. at 3689.

On October 27, 2016, the Navy awarded the contract to Seaward. Id. Tab 124 at 3690.

## IV.    GAO Protests

On October 27, 2016, Munilla requested a debriefing. Id. Tab 129 at 3873. During the debriefing, which took place November 1, 2016, the Navy provided Munilla with Seaward's CLIN pricing. See id. at 3868–72. On October 28, 2016, both Crowley and SoBran also requested debriefings. Id. Tab 127 at 3863; id. Tab 130 at 3877. Crowley's debriefing occurred November 2, 2016, while it appears that SoBran's occurred via telephone on October 31, 2016. See id. Tab 127 at 3861; id. Tab 130 at 3875. Finally, Metson requested a debriefing on November 1, 2016. Id. Tab 128 at 3867. The Navy provided a written debriefing that day. Id. at 3866.

On November 7, 2016, Metson filed a bid protest with the Government Accountability Office (GAO). Id. Tab 132 at 3897. On November 17, 2016, however, Metson withdrew its protest and GAO closed the matter. See id. at 3895.

In the meantime, Munilla filed its own protest with GAO on November 3, 2016. Id. Tab 131 at 3881–82. It noted that "[t]hough the words 'cost realism' were not used in the solicitation, the evaluation criteria does require that the 'price [be] fully justified and supported and [be] considered fair under current market conditions as well as reasonable to both the Offeror and the Government.'" Id. at 3888. It further observed that "[t]he Awardee's pricing for the base period is substantially lower than the pricing for the incumbent contractor, [Munilla]," and that "[t]he Contract Line Item pricing substantially varies from reasonable pricing." Id. Seaward's pricing, Munilla contended, "demonstrate[d] a fundamental misunderstanding of the requirement[s] and the circumstances at Guantanamo Bay." Id. at 3887. In short, according to Munilla, the price evaluation "fail[ed] to conform with the requirements contained in the solicitation." Id. at 3888.

On December 14, 2016, GAO dismissed Munilla's protest. Id. Tab 145 at 4012. It found no merit to Munilla's argument "that [Seaward's] price is too low for it to perform the requirement," noting that "[a]n agency's concern in making a price reasonableness determination is whether the offered prices are too high, rather than too low." Id. It explained that "[a]rguments that the agency did not perform an appropriate analysis to determine whether prices are too low, such that there may be a risk of poor performance, concern price realism not price reasonableness," and that "price realism is not required to be evaluated by the agency unless the solicitation provides for such an analysis," which this one did not. Id. at 4012–13.

## V.   This Action

Munilla filed its complaint in this Court on December 22, 2016. ECF No. 1.[5] In its original complaint, Munilla alleged that both Seaward's and SoBran's prices were "unreasonable to the Offeror and/or the Government" and "significantly understated and unbalanced." Compl. ¶ 28. Accordingly, Munilla argued that the Navy failed to engage in the proper price analysis to determine price reasonableness as required by the Solicitation and the FAR. See id. ¶ 40. It requested a temporary restraining order as well as preliminary and permanent injunctive relief. See id. at 16–18.

The Court held oral argument on Munilla's request for a temporary restraining order on December 23, 2016. See Order, ECF No. 12. On the same day, it issued orders denying that request and establishing an expedited briefing schedule for deciding the case on cross-motions for judgment on the administrative record. See Orders, ECF Nos. 25 & 26.

On December 30, 2016, Munilla filed an amended complaint. ECF No. 31. Its amended complaint challenges the Navy's evaluation of both Seaward's and Crowley's proposals. See Am. Compl. ¶ 4. Munilla continues to seek preliminary and permanent injunctive relief on the grounds that the Navy failed to perform a price reasonableness analysis and failed to conduct a CLIN-by-CLIN comparison "to determine if [the CLINs] were understated or overstated." Id. ¶¶ 57–58. Munilla also still asserts that Seaward's pricing is "significantly understated" such that its "total proposal price [is] unreasonably low, not fully justified and supported, not fair under current market conditions, and not reasonable to both the Offeror and the Government." Id. ¶ 59. It now also alleges that Crowley's pricing was "improperly incomplete" and that "the Navy improperly modified Crowley's pricing." Id. ¶ 64.

The Court heard oral argument on the parties' pending cross-motions on January 23, 2017. See Order, ECF No. 25.

---

[5] Several days before this action was filed, on December 19, 2016, the Navy issued Amendment P00001 to its contract with Seaward. AR Tab 147 at 4015. Through the amendment, the Navy revised the periods of performance. Id. As amended, the contract requires Seaward to work with Munilla for a transitional period from January 1, 2017 through January 31, 2017, and to begin full performance on February 1, 2017. See id. at 4016.

**DISCUSSION**

I.      **Subject Matter Jurisdiction**

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that §1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Weeks Marine, Inc., 575 F.3d at 1359–62 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). "In other words, the protestor's chance of securing the award must not have been insubstantial." Info Tech. & Applications Corp., 316 F.3d at 1319. The Court assumes well-pled allegations of error in the complaint to be true when making the standing determination. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)); see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1131–32, 1131 n.9 (Fed. Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)) (noting that at motion to dismiss stage, analysis is whether plaintiffs have sufficiently alleged elements of standing, not whether they will ultimately prevail on merits); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694–95 (2010) (noting that the showing of prejudice as an element of standing "turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true," and distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

In this case, Munilla alleges that the Navy "fail[ed] to evaluate properly Seaward's proposal and the proposal of [Crowley]." Am. Compl. ¶ 4. More specifically, it alleges that the "Navy did not perform the price analyses required by the RFP and the FAR" and that "the Navy did not perform a price analysis to determine whether the pricing was fully justified and supported, or was fair under current market conditions as well as reasonable to both the Offeror and the Government." Id. ¶ 40. Munilla also alleges that the Navy violated the terms of the Solicitation and the FAR by "not perform[ing] a line item price analysis to determine whether Seaward's or Crowley's prices were significantly over or understated." Id. ¶ 41. It further claims that "[a]n analysis of Seaward's price proposal reveals that it was not fully justified and supported, fair under current market conditions, or reasonable to both the Offeror and the Government," and that both Seaward's and Crowley's proposed prices were unbalanced. Id. ¶¶ 42–45. In addition, Munilla alleges that the Navy should have found Crowley's proposal unacceptable because "Crowley did not provide a price for each CLIN as required by the RFP." Id. ¶ 44. As a result of all of these alleged errors, Munilla claims, it was "depriv[ed] . . . of award of the contract as the offeror with the lowest reasonably priced proposal that is not understated or overstated or unbalanced and that is technically acceptable." Id. ¶ 49.[6]

The government and Seaward dispute Munilla's standing to challenge the award to Seaward. They argue that Munilla's claims regarding the evaluation of Crowley's proposal lack merit, and point out that Crowley was next in line to receive the award because its offer was the next lowest-priced technically acceptable offer. Therefore, according to the government and Seaward, Munilla has not demonstrated that it would have a substantial chance of receiving the award, because even if the award to Seaward were set aside, it would go to Crowley, not Munilla. See Intervenor's Mem. in Supp. of Its Cross-Mot. for J. on the Admin. R. and in Resp. to Pl.'s Mot. for J. on the Admin. R. (Intervenor's Mem.) at 15, ECF No. 40; Def.'s Mot. to Dismiss, Mot. for J. on the Admin. R., and Opp'n to Pl.'s Mot. for J. on the Admin. R. (Def.'s Mot.) at 11–14, ECF No. 41.

These contentions are unpersuasive. As noted above, the determination of standing is dependent on the allegations in the complaint. While the government points out that the Court may consider evidence challenging "jurisdictional facts" when addressing Munilla's standing, Def.'s Reply in Supp. of Its Mot. to Dismiss & Reply in Supp. of Its Mot. for J. on Admin. R. at 2, ECF No. 46 (citation omitted), its objections here (and those of Seaward) do not depend upon factual evidence. Rather, they are predicated upon the merits of Munilla's legal allegations. For example, Munilla has alleged that the Navy should have found Crowley's proposal unacceptable because, Munilla argues, Crowley's pricing proposal did not comply with the RFP's requirements with respect to the reimbursable CLINs. If this argument were meritorious as a matter of law (as the Court must assume for purposes of determining standing), then Munilla's

---

[6] In its amended complaint, Munilla also claimed that the Navy's award decision was based on an alleged "bait and switch" or material misrepresentation. See Am. Compl. ¶¶ 51–55, 60, 65. It observed that Seaward identified seven individuals as key personnel in its proposal, but alleged that, as a matter of fact, Seaward is "now attempt[ing] to hire [Munilla]'s key employees." Pl.'s Mem. of Law in Supp. of Its Mot. for J. on the Admin. R. (Pl.'s Mem.) at 28–29, ECF No. 32. Munilla abandoned this claim at oral argument. Oral Argument of January 23, 2017 at 26:52. Accordingly, the Court will not address it either for purposes of standing or on the merits.

proposal would move to second in line, thereby neutralizing the standing objections posed by the government and Seaward.

Similarly, if Munilla is correct that the Navy's evaluation of Seaward's and Crowley's price proposals was flawed, then the Navy would be required to re-evaluate the proposals consistent with the Solicitation's criteria (or, if it chose, re-solicit new proposals). The Court cannot determine how the price proposals would be ranked if they were re-evaluated consistent with what Munilla claims are the appropriate standards. Thus, based upon Munilla's allegations, it is an interested party and has standing to bring this protest. See Per Aarsleff A/S v. United States, 121 Fed. Cl. 603, 622–23 (2015) (holding that highest-priced offeror in lowest-price technically acceptable solicitation had standing where it challenged pricing evaluation process and alleged flaws in lower-priced offerors' proposals), rev'd on other grounds, 829 F.3d 1303 (Fed. Cir. 2016); Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 61–62 (2014) (finding plaintiff had standing where it alleged "systemic defects" in evaluation process and it was "not entirely clear which of the bidders would be next in line" if the evaluation process had to be redone).

## II.      Standards of Review

### A.      Motions for Judgment on the Administrative Record

Parties may move for judgment on the administrative record pursuant to Rules of the Court of Federal Claims (RCFC) 52.1. Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

### B.      Bid Protest Cases

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp.,

Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"). A disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni Geom., 238 F.3d at 1338.

## III.   Munilla's Motion to Supplement the Administrative Record

Before turning to the merits of Munilla's protest, the Court must determine whether to consider certain extra-record material upon which Munilla relies in support of its legal arguments. Thus, during the course of this case, Munilla has filed the declarations of two of its employees ([***] and [***]), and two of its subcontractors' employees ([***] and [***]). Pl.'s Mem. Ex. 1 at ¶ 1; Pl.'s Reply Mem. in Supp. of Its Mot. for J. on the Admin. R., & Resp. to Def.'s Mot. (Pl.'s Reply) Ex. 2 at ¶ 1, ECF No. 45; Pl.'s Reply Ex. 1 at ¶¶ 1, 3; Mot. for TRO, Prelim. Inj., & Permanent Inj. (TRO Mot.) Ex. 3 at ¶¶ 1–2, ECF No. 5. The [***] and [***] declarations were submitted in conjunction with both Munilla's initial motion for a temporary restraining order and its motion for judgment on the administrative record. TRO Mot. Exs. 1–2; Pl.'s Mem. Ex. 1; Pl.'s Reply Ex. 2. The [***] declaration was submitted with the former motion, TRO Mot. Ex. 3, while the [***] declaration was submitted with the latter, Pl.'s Reply Ex. 1.

On January 12, 2017, the government moved to strike all "extra-record material relied on" by Munilla. Def.'s Mot. to Strike Extra-R. Material Relied on in Pl.'s Mot. for J. on the Admin. R., ECF No. 38. On January 17, 2017, Munilla filed its opposition to the government's motion to strike, along with a motion to supplement the administrative record with the declarations. ECF Nos. 44 & 44-1.

It is well established that, in a bid protest case, the Court of Federal Claims is to "apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents" to it. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (emphasis in original). Therefore, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Id. (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). This limitation guards against the possibility that the court's scope of review will be transformed from an examination of the reasonableness of the agency's determination under APA standards "into effectively de novo review." Id. at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)).

In light of these principles and concerns, the court of appeals has held that in bid protests, "supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." Id. (quotation omitted). There are no hard and fast rules about when extra-record evidence is necessary to permit effective judicial review. But examples of such circumstances include cases in which a party seeks to introduce evidence of "tacit knowledge possessed by offeror and agency personnel of a highly technical and complex nature, requiring explication via affidavits or expert testimony"; where it is necessary for the court to consider "information intentionally left out of the record, such as evidence of bias or bad faith"; and where there exists "relevant information, contained in the procurement files or generally known in an industry or discipline, which was inappropriately ignored by an agency." E. W., Inc. v. United States, 100 Fed. Cl. 53, 57 (2011) (citations omitted) (rejecting plaintiff's motion to supplement administrative record with declaration of plaintiff's corporate officer).

The declarations with which Munilla seeks to supplement the administrative record do not fall into any of these categories. And the Court concludes that their consideration is not otherwise necessary for it to conduct effective review of the Navy's decision.

The general subject matter of the declarations includes, among other things, Munilla's past performance history, characterizations of communications between Munilla and the Navy during the debriefing process, and comparisons of Munilla's prices with those of Seaward (including opinions regarding the reasonableness of Seaward's prices for particular line items, whether prices were below cost, and whether particular line items were significantly overstated or understated). All of the declarations were prepared subsequent to the initiation of litigation; none were considered by the Navy in reaching its award decision.

Portions of the declarations might be appropriate to consider in conjunction with Munilla's arguments regarding the propriety of prospective injunctive relief in this case if the Court were to find the protest meritorious (which, as discussed below, it does not). See PlanetSpace, Inc. v. United States, 90 Fed. Cl. 1, 5 (2009) (distinguishing between admissible evidentiary submissions that go to prospective relief sought in the court and evidence whose admission is sought to address the reasonableness of the agency decision under review). But they may not be admitted as supplements to the administrative record because they are offered as a basis for rebutting or casting doubt upon the agency's conclusions—based on the record before it—that the price proposals of Seaward (and/or Crowley) were reasonable and not unbalanced. The principles outlined in Axiom do not allow the Court to consider declarations prepared after the fact for purposes of persuading it to substitute its judgment for that of the agency with respect to the agency's evaluation of the offerors' proposals. See Axiom Res. Mgmt., Inc., 564 F.3d at 1379–80. For these reasons, Munilla's motion to supplement the administrative record must be **DENIED**; the government's motion to strike the declarations submitted in support of Munilla's motion for judgment on the administrative record is **GRANTED**.

## IV.    Merits

### A.    Price Reasonableness

Munilla's first allegation of error concerning the contract award to Seaward is that the Navy failed to comply with the RFP's requirement that the Navy determine whether the offerors'

prices were "fully justified and supported and . . . considered fair under current market conditions as well as reasonable to both the Offeror and the Government." Pl.'s Mem. at 24–25 (quoting the Solicitation). According to Munilla, the requirement that the Navy determine whether the price proposal was "reasonable to both the Offeror and the Government" meant that the Navy was obligated to determine not only whether Seaward's prices were too high, but also whether they were too low. Id. at 25. Because the Navy failed to make the latter determination, Munilla argues, its evaluation of Seaward's price proposal did not comport with the RFP. See id. at 25–26.

Munilla's argument lacks merit. As FAR 15.404-1(b)(2) provides, the "Government may use various price analysis techniques and procedures to ensure a fair and reasonable price." One such technique or procedure is to compare the "proposed prices received in response to the solicitation," as "[n]ormally, adequate price competition establishes a fair and reasonable price." Id. § 15.404-1(b)(2)(i).[7] In fact, such a comparison is one of the FAR's two "preferred techniques" for determining whether a price proposal is fair and reasonable. Id. § 15.404-1(b)(3).

The RFP in this case adopted the price reasonableness approach set out in the FAR. Contrary to Munilla's argument, the RFP did not require the Navy to base its price reasonableness decision on a determination that the offerors' prices were "fully justified and supported and . . . considered fair under current market conditions as well as reasonable to both the Offeror and the Government." In fact, the Solicitation did not even permit offerors to submit the kind of cost and other data that would have allowed for such an analysis. See AR Tab 25 at 477–79.

Rather, consistent with the FAR, the RFP provided that "[r]easonableness may also be determined by comparing the proposed pricing with Government estimates and/or other offers received." Id. at 490–91 (emphasis added). Contrary to Munilla's assertions, and as described in some detail above, the Navy followed this directive and determined reasonableness by comparing prices received in response to the Solicitation. Id. Tab 123 at 3684. Thus, the Approved Business Clearance memorandum contains a finding that "[t]his solicitation has provided adequate competition" and concludes that "[p]rice analysis has been performed and [Seaward's] price has been determined fair and reasonable by the Contracting Officer based on adequate price competition in accordance with FAR 15.404-1(b)(2)(i)." Id. at 3688–89 (emphasis added).

There is similarly no merit to Munilla's argument that, in determining price reasonableness, the Navy was also required to make a finding as to whether the offerors' prices were "too low." As GAO observed in rejecting Munilla's protest, "[a]n agency's concern in making a price reasonableness determination is whether the offered prices are too high, rather than too low." Id. Tab 45 at 4012. A determination of whether an offeror's prices are too low is

---

[7] In noting that adequate price competition normally establishes a fair and reasonable price, FAR 15.404-1(b)(2)(i) refers to FAR 15.403-1(c)(1)(i). That provision states, in pertinent part, that "[a] price is based on adequate price competition if . . . two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement." Id. § 15.403-1(c)(1)(i).

made when an agency conducts a cost or price realism analysis. <u>See</u> FAR 15.404-1(d) ("Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed . . . ."); <u>see also</u> <u>i4 Now Sols., Inc.</u>, B-412369, 2016 WL 537216 (Comp. Gen. Jan. 27, 2016) (stating that "[a]rguments that the agency did not perform an appropriate analysis to determine whether prices are too low, such that there may be a risk of poor performance, concern price realism not price reasonableness; price realism is not required to be evaluated by the agency unless the solicitation provides for such an analysis").[8]

The FAR "does not mandate that the agency conduct a price realism analysis" in a fixed-price contract setting. <u>ViON Corp. v. United States</u>, 122 Fed. Cl. 559, 573 (2015) (citing FAR 15.402(a)). And, a cost realism analysis was <u>not</u> required by the RFP. <u>See</u> AR Tab 25 at 490–91. In fact, as described above, in its response to questions received, the Navy made clear that it would be assessing only reasonableness, not price realism. Thus, when SoBran noted the potential utility of determining whether an offeror's price proposal was too low and asked whether the Navy would consider performing a "Price Realism Analysis in addition to the Price Reasonableness evaluation," AR Tab 43 at 741, the Navy responded in the negative, stating that it would "conduct a Price Reasonableness evaluation in accordance with Section M," <u>id.</u> Tab 45 at 760.

Munilla's reliance on <u>ViON</u> as a basis for requiring the Navy to make a determination as to whether Seaward's prices were too low is misplaced. <u>See</u> Pl.'s Mem. at 25. The court in <u>ViON</u> noted that although a price realism analysis was not a mandatory requirement for firm fixed-price contracts, an agency could commit itself to performing one if the solicitation "provides that unrealistically low offers may be considered unacceptable and rejected on that basis." 122 Fed. Cl. at 573 (quotations omitted). There, the court found the agency committed itself to a price realism analysis because the solicitation stated that the government could "reject any proposal that is . . . unreasonably high or low in price when compared to Government estimates, such that the proposal is deemed to reflect an inherent lack of competence [or] failure to comprehend the complexity and risk of the program." <u>Id.</u> (emphasis omitted, omission in original, brackets added).

There is no similar language in this RFP. Nothing in the Solicitation indicates the Navy would assess price as a proxy for determining an offeror's understanding of contract requirements and nothing otherwise committed the Navy to a realism analysis. Indeed, as noted, the Navy rejected the suggestion that it conduct a price realism analysis. AR Tab 45 at 760. Accordingly, there is no merit to Munilla's argument that the Navy failed to conduct a price reasonableness analysis that was consistent with the RFP when it found the price proposals reasonable based on adequate price competition.

---

[8] Although GAO opinions are not binding on the Court of Federal Claims, the Court "may draw on GAO's opinions for its application of [its] expertise." <u>See</u> <u>Allied Tech. Grp., Inc. v. United States</u>, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011); <u>see also</u> <u>Univ. Research Co., LLC v. United States</u>, 65 Fed. Cl. 500, 503 (2005) (noting that GAO decisions are not binding on the court but "are persuasive").

B.   **Unbalanced Pricing Analysis**

Munilla's second challenge to the Navy's price evaluation is predicated on an argument that the Navy failed to comply with the RFP provisions requiring the Navy to evaluate the price proposals for lack of balance. The RFP stated that unbalanced pricing "exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques." Id. Tab 25 at 491; see also FAR 15.404-1(g)(1). It further provided that, "[i]n accordance with FAR 15.404-1(g)(2)[,] a price analysis will be conducted on the individual CLINs to determine whether unbalanced pricing occurred." AR Tab 25 at 491. According to Munilla, the Navy failed to conduct such a price analysis on the individual CLINs, but only analyzed whether the offerors' proposals were unbalanced on a total price basis. Pl.'s Mem. at 22. For the reasons set forth below, Munilla's arguments are unpersuasive.

1.   **The Risks of Unbalanced Pricing**

As one procurement law expert has explained, "[u]nbalancing in bids generally is associated with uncertainty about the amount of work that the Government will actually call upon the contractor to perform." Daniel I. Gordon, Unbalanced Bids, 24 Pub. Cont. L.J. 1, 2 (1994). Thus:

> Unbalanced bids arise in two quite different contexts: in solicitations covering a base period and option periods and in solicitations for multiple-line-item requirements contracts. In option-period solicitations, the unbalanced bid offers relatively high prices for the base period and relatively low prices for the later option periods. In requirements-contract solicitations, the unbalanced bid includes high prices for some items and low prices for others.

Id. at 2–3 (footnotes omitted).

With respect to option-period solicitations, like the present one, "the solicitation typically states that the Government will evaluate bids on the basis of the prices for the base period and all options; thus, the Government assumes, in calculating the total amount of each bid, that it will actually exercise all options." Id. at 3. "Determining which bid is low is thus predicated . . . on a prediction about future Government purchases under the contract." Id. An unbalanced offer in this context is one that proposes relatively high prices for the base period but relatively low prices for the later option periods, with the risk that the overall price paid will be too high and the contractor will receive a windfall if all of the option years are not exercised. See id. at 3–5; see also Ralph C. Nash & John Cibinic, Unbalanced Bids and Proposals: Trying to Beat the System, 5 No. 4 Nash & Cibinic Rep. ¶ 21 (1991) (commenting on use of a "front-end loading ploy" in which money from the earlier billings "will more than make up for the underpricing" in the later years; such a "ploy" is used in the hope that the base year will finance later option-year work or that the options will not be exercised).[9] In addition, an overpriced base year is of concern

---

[9] On the other hand, with respect to an IDIQ contract, the government is predicting "that it will order the various line items in the quantities estimated in the solicitation." Gordon, supra, at 3.

because it may result in the provision of an impermissible advanced payment to the contractor. See Ultimate Concrete, LLC v. United States, 127 Fed. Cl. 77, 83–85 (2016).

### 2.     The Navy's Evaluation

In this case, the record reflects that the Navy conducted a pricing analysis to detect unbalanced pricing consistent with the principles set forth above and with the RFP's requirements. Specifically—and contrary to Munilla's assertions—the record confirms that the Navy did conduct a "price analysis . . . on the individual CLINs to determine whether unbalanced pricing occurred." See AR Tab 25 at 491. Indeed, the record is replete with evidence of the Navy's consideration of individual CLINs in its discussion of whether the offerors' prices were unbalanced as between each of the performance periods set forth in the contract.

First, as described above, the Navy created the six-page detailed abstract of proposals, which consisted of a table listing side-by-side each offeror's prices for each CLIN for the base year and each potential option year. Id. Tab 122 at 3604–08. This table, in turn, was designated as Attachment 5 and referenced in the Approved Business Clearance memorandum. Id. Tab 123 at 3683. It serves as a useful reference to the Navy's narrative discussion of individual CLINs in its evaluation of whether the offerors' pricing proposals were unbalanced. See id.[10]

Second, the Approved Business Clearance memorandum represents that the "Contracting Officer evaluated the Contractors' proposed prices for Base Year and Option[] I through Option IV to determine whether unbalanced pricing occurred." Id. at 3684. Further, after each chart and analysis regarding the year-to-year prices contained in each offer, the contracting officer concluded that "no unbalanced pricing exist[ed]" with respect to each pair of performance periods. Id. at 3685–86. As described above, unbalanced pricing exists when "the price of one or more contract line items is significantly over or understated." Id. Tab 25 at 491. In representing that the contracting officer evaluated the "proposed prices . . . to determine whether unbalanced pricing occurred," and that "no unbalanced pricing exist[ed]," the Navy was necessarily representing that the contracting officer evaluated the individual CLINs and determined that they were not significantly overstated or understated. See id. Tab 123 at 3684–86.

Further, the narrative evaluation of the price proposals contains references to those individual CLINs that the Navy apparently considered most relevant to the balanced pricing

---

The risk of unbalanced pricing in this context is realized when the government ends up ordering more of the higher-priced line items and fewer of the lower-priced items than it originally predicted. See id. at 3–5.

[10] The Court finds unpersuasive Munilla's effort to downplay the significance of the creation of the detailed comparison table by stating that the table "merely array[ed], by contract year, each offeror's unit price and sum[med] them into a total for the year." Pl.'s Reply at 12. The table, which (as noted) was included as an attachment to the Approved Business Clearance memorandum and referenced therein, contains precisely the information that Munilla alleges the Navy did not consider, organized in a fashion that facilitates the comparison among individual CLINs that Munilla urges was required but not conducted.

analysis. For instance, in assessing the reasons for the slight decline in price for all offerors between the first and second option years, the Navy took note of the fact that the contractor would only be "required to perform one (1) DROH [docking regular overhaul] off-island during the second Option Year," whereas two "DROHs (one-off island and one on-island) will be performed during the first Option Year." Id. at 3685. It also compared the CLIN prices for the DROH work in those two option years, and observed that "[a] review of each Offeror's Price Proposal indicates that their proposed price for the DROH off-island for Option II is in line with their proposed price for the DROH off-island for Option I." Id.

The memorandum includes a similar discussion with respect to option years II and III, in which it also explicitly references Attachment 5, the detailed abstract breaking down the offerors' proposals on a CLIN by CLIN basis. It noted that a difference in DROH requirements explained the price decreases except for Metson, with respect to which the contracting officer stated that "[a]s illustrated in the detailed abstract of proposals, Metson's proposed price for the DROH on-island is significantly higher than the other three Offeror[]s['] proposed prices." Id. at 3685–86 (emphasis added). And again, when evaluating option years III and IV, the contracting officer noted that a "review of each Offeror's Price Proposal indicates that their proposed price for the DROH on-island for Option IV is in line with their proposed price for the DROH on-island for Option III." Id. at 3686.

### 3.    Munilla's Arguments

Notwithstanding the foregoing, Munilla contends that the Navy did not perform an adequate analysis of the individual CLINs as evidenced by its failure to specifically discuss certain other CLINs for which it claims there were disparities between Seaward's prices and those of Munilla. According to Munilla, these disparities show that Seaward's pricing was overstated with respect to certain CLINs, and understated with respect to others. See Pl.'s Mem. at 26–28. But a protester cannot demonstrate unbalanced pricing "merely by showing that [the awardee's prices] were lower than [its] prices." Avtel Servs., Inc. v. United States, 70 Fed. Cl. 173, 225 (2005). Further, neither the Solicitation nor the FAR requires the Navy to discuss each individual CLIN and explain why it concluded that any particular price differentials between offerors' proposals as to that CLIN did not evince material unbalancing. See, e.g., AR Tab 25.

Indeed, in addressing the adequacy of the agency's discussion it is important to keep in mind that the FAR does not require agencies to reject every price proposal that is unbalanced, but permits them to reject those that present an unacceptable risk to the government, as described above. Id. at 490–91; 48 C.F.R. § 15.404-1(g)(3); see also Al Ghanim Combined Grp. v. United States, 56 Fed. Cl. 502, 515 n.17 (2003) (observing that "[a] distinction exists between materially and mathematically unbalanced proposals" and that "[a] material imbalance occurs if an award fails to represent the lowest ultimate cost to the Government or the imbalance is such that it will adversely affect the integrity of the bidding system" (quotation omitted)). To the extent that the Navy did or did not discuss particular individual CLINs, its approach was consistent with the understanding that, in the context of a firm fixed-price contract, the risk to the government of unbalanced prices does not hinge upon whether specific line items are overpriced or underpriced

within a single performance period.[11] Instead, the risk depends upon whether there is "front loading": unbalanced pricing between the initial years and subsequent option years. See Part IV.B.1, supra.

A discussion of the prices of individual CLINs for purposes of the Solicitation, therefore, was of most relevance in connection with a comparison between the prices charged for each performance period. And it is that context in which the Navy included a discussion of its evaluation of individual CLINs. See Survival Sys., USA, Inc. v. United States, 102 Fed. Cl. 255, 270 n.14, 272 (2011) (distinguishing detailed CLIN-by-CLIN analysis required in procurement for an IDIQ contract from unbalanced pricing analysis in procurement for fixed-price services contract).[12]

In short, the record establishes that the Navy adhered to the RFP's requirements both with respect to its evaluation of the reasonableness of the price proposals and of whether the proposals evinced unbalanced pricing.[13] Accordingly, Munilla's challenge to the Navy's evaluation of Seaward's price proposal lacks merit.

---

[11] With a firm fixed-price contract like the present one, the price "is not subject to any adjustment on the basis of the contractor's cost experience," so that the contractor bears "maximum risk and full responsibility for all costs and resulting profit or loss." FAR 16.202-1; see also First Enter. v. United States, 61 Fed. Cl. 109, 125 (2004) (noting that "[b]ecause this protest involves a fixed-price contract—not, for example, a cost reimbursement or indefinite delivery/indefinite quantity contract—[the contractor] would be unable to alter the contract price after award and, therefore, unable to recoup losses from the government" (footnote omitted)).

[12] Munilla cites Al Ghanim Combined Group in support of its argument that the Navy failed to conduct an adequate analysis of the individual CLINs to determine whether Seaward's price proposal was unbalanced. Pl.'s Mem. at 23–24. But that case involved an indefinite delivery/indefinite quantity contract and the agency acknowledged that it only looked at each offeror's total price and "performed no cost analysis whatsoever." Al Ghanim Combined Grp., 56 Fed. Cl. at 503, 506, 512–14. This case involves a fixed-price contract and the Court has found that the Navy did in fact perform a price analysis, which included a review of individual CLINs to determine whether the offerors' price proposals were unbalanced. Al Ghanim Combined Group is therefore distinguishable from this case.

[13] In light of its conclusion that the Navy's evaluation of Seaward's price proposal was consistent with the RFP, it is unnecessary for the Court to address Munilla's argument that the Navy should have found Crowley's price proposal unacceptable for failure to properly fill in the price lines for the reimbursable CLINs. It also need not address Munilla's argument that it was prejudiced by the Navy's alleged failure to comply with the RFP's evaluation requirements because what it calls a "proper CLIN-by-CLIN analysis would have revealed that Seaward's pricing was unreasonably understated in some line items and unreasonably overstated on others." Pl.'s Reply at 17.

**CONCLUSION**

Based on the foregoing, Munilla's motion for judgment on the administrative record is **DENIED** and the government's and Seaward's cross-motions for judgment on the administrative record are **GRANTED**. In addition, Munilla's motion to supplement the administrative record is **DENIED** and the government's motion to strike the declarations submitted in support of Munilla's motion for judgment on the administrative record is hereby **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

    **IT IS SO ORDERED.**


s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge